UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHARISE GREER,

    Plaintiff,

v.

STATE FARM INSURANCE COMPANY,

    Defendant.

Case No. 14-cv-13639
Honorable Laurie J. Michelson
Magistrate Judge Michael J. Hluchaniuk

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [16] AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [18]**

    Plaintiff Sharise Greer bought homeowner's insurance, automobile insurance, and life insurance from Defendant State Farm Insurance Company. To pay the combined monthly premium she owed on the three policies, she authorized State Farm to automatically withdraw the funds from her bank account each month. This did not go well. State Farm withdrew different amounts each month without explanation, so a frustrated Greer started to pay her insurance agent directly. After determining that Greer had fallen behind in payments on the automobile and homeowner's insurance policies, State Farm sent her cancellation notices in four consecutive months. For the first three months, Greer responded by paying at least some of what State Farm said she owed. She did not pay in the last month. But by that point, how much she was behind on the premiums for any specific policy and how the funds would be paid was unclear.

    Shortly after that last payment was due, someone vandalized Greer's home, so she filed a claim with State Farm. But State Farm denied her coverage, saying that her homeowner's insurance policy had lapsed because she failed to pay the premium specified in the last

cancellation notice. Greer sued in Michigan state court, asserting claims for breach of express and implied contract and negligence. State Farm removed the action to this Court.

Before the Court are the parties' cross-motions for summary judgment. (Dkt. 16, Def.'s Mot. Summ. J.; Dkt. 18, Pl.'s Mot. Summ. J.) After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motions. *See* E.D. Mich. LR 7.1(f)(2). The Court finds that while Greer is not entitled to summary judgment, she has raised a genuine issue of material fact as to whether her policy had lapsed at the time of her claim. Therefore, Greer's contract claim (Count II) survives summary judgment. However, State Farm is entitled to summary judgment as to Greer's negligence claim (Count III), and to Greer's claim that State Farm breached an implied contract, which is part of her Count II.

## I.

### A.

On January 25, 2013, Defendant State Farm Insurance Company issued Plaintiff Sharise Greer policies for automobile insurance, life insurance, and homeowner's insurance. (Dkt. 16, Def.'s Mot. Ex. A, Vickers Aff. ¶ 4.) The homeowner's insurance policy—under which Greer would later file the claim at issue in this case—covered her home on Whitcomb Street in Detroit, Michigan. (*Id.* ¶ 4.) Greer purchased the homeowner's policy through the Angela Hughes Agency in Detroit. (*Id.* ¶ 2.)

The homeowner's policy became effective on January 25, 2013 and was initially set to expire a year later. (Dkt. 18, Pl.'s Mot. Ex. 2–A, Policy at 2.) It covered up to $80,800 for losses to Greer's home and $60,600 for losses to her personal property. (*Id.*) It also covered "Actual Loss Sustained" for "Loss of Use." (*Id.*)

The policy stated that State Farm would provide insurance "based on [Greer's] payment of premium for the coverages [she] chose." (*Id.* at 4.) Greer agreed to "pay premiums when due and comply with the provisions of the policy." (*Id.*) The policy also provided: "When you have not paid the premium, we may cancel at any time by notifying you at least 10 days before the date cancellation takes effect. This condition applies whether the premium is payable to us or our agent or under any finance or credit plan." (Ex. 2–C, Policy at 19, Section I and Section II – Conditions, § 5b(1).)

The annual premium for the homeowner's policy was $1,552.00, payable in monthly installments of $129.33. (Pl.'s Mot. Ex. 4, Policy Application.) Taken together, the total monthly premium for the homeowner's, life, and automobile insurance policies was $491.00, which included a $2.00 service charge. (Pl.'s Mot. Ex. 6, Payment Breakdown.)

When Greer purchased the policies, she signed a form authorizing State Farm to deduct the monthly premium payments from her bank account on the 28th of each month. (Pl.'s Mot. Ex. 6, Request for State Form Payment Plan's Recurring Monthly Payment Option.) The payment form indicated that State Farm "has the right to discontinue the recurring payment option for any reason" and that State Farm "will send notification to [Greer] at least ten (10) days in advance whenever the payment amount or the requested payment date changes." (*Id.*) The form also stated that Greer could terminate State Farm's authority to withdraw payments from her account "at least ten (10) business days before the next scheduled payment" with "written or electronic notification." (*Id.*) Though this does not appear to have played a role in the problems that followed, the payment form misidentified Greer's bank as Comerica Bank instead of Michigan First Credit Union. (Greer Aff. ¶ 8.)

3

**B.**

Greer paid the first monthly installment of $491 in person at the Hughes Agency on January 25, 2013. (Pl.'s Mot. Ex. 1, Greer Aff. ¶ 14.) Greer says that Daishi Vickers from the agency told her the remaining payments would be deducted from her account each month. (Greer Aff. ¶ 14.) But going forward, for reasons the record does not make clear, State Farm never withdrew from Greer's account the standard $491 monthly installment she originally expected.

For instance, on February 23, 2013, State Farm informed Greer by letter that the premium amount due for February had been revised to $389.47, and State Farm deducted that amount from her account on February 28. (Pl.'s Mot. Ex. 10, Letter from Michelle Buck; Pl.'s Mot. Ex. 9, Feb.–Apr. Bank Stmt. at 6.) Greer says State Farm never explained why the premium changed. (Greer Aff. ¶ 16.) And, confusingly, State Farm still billed her for $490.36 in February. (Def.'s Mot. Ex. C, State Farm's Payment and Bill History at 2; *see also* Def.'s Mot. Ex. L, Bosford Aff. ¶¶ 4–5 (noting that the Payment and Bill History document "lists the dates and amounts of the bills sent to Ms. Greer" and "identifies the dates Ms. Greer's payments were processed").)

March was no less confusing. That month, instead of billing Greer for the agreed $491 premium for the three policies, State Farm billed her for only $156.11 and withdrew that amount from her account on March 29. (State Farm's Payment and Bill History at 2; Feb.–Apr. Bank Stmt. at 2.) Greer says State Farm never notified her of the changed premium value. (Greer Aff. ¶ 17.) It may have resulted from State Farm cancelling Greer's automobile insurance policy. Greer says that in February or March, her auto finance company informed her that State Farm had cancelled her auto policy for non-payment of premium, but she says State Farm never told her the same. (Greer Aff. at ¶ 18.) In any case, Greer says that because of "problems created by State Farm failing to deduct and pay the correct premium payments," she asked the Hughes

Agency to stop automatic withdrawals, and State Farm agreed (though Vickers says this did not happen until May). (Greer Aff. ¶ 19; Vickers Aff. ¶ 8.)

In April 2013, State Farm billed Greer $635.17 instead of $491.00. (Payment and Bill History at 2.) Because the combined monthly premium for the homeowner's insurance and life insurance policies was $155.05, this much larger value would suggest that State Farm had reinstated Greer's auto insurance policy. But the record is unclear, and Greer says that State Farm again failed to explain why she owed this new amount. (*See* Greer Aff. ¶ 21.) For her April payment, instead of proceeding with the scheduled automatic payment, Greer paid the amount she originally agreed to pay—$491—directly to the Hughes Agency. (Payment and Bill History at 2; Greer Aff. ¶ 20.) State Farm accepted the payment.

For May 2013, State Farm billed Greer another new amount, $144.17 instead of $491.00. (Payment and Bill History at 2; Greer Aff. ¶ 22.) On May 10, 2013, State Farm sent Greer a cancellation notice saying that if she did not pay $144.17 before May 25, 2013, her homeowner's insurance policy would be cancelled on May 27. (Def.'s Mot. Ex. D, May Cancellation Notice.) On May 20, Greer made a payment of $145 at the Hughes Agency's office, so her policy was not cancelled. (Vickers Aff. ¶ 9; Greer Aff. ¶ 22.)

In early June, despite Greer's previous request to stop the automatic withdrawals, State Farm billed Greer for another $634.34 and tried to withdraw that amount from her account. (Payment and Bill History at 2; Pl.'s Mot. Ex. 12, May–Jul. Bank Stmt. at 4; Greer Aff. ¶ 23.) She says this change in amount was again without explanation. (Greer Aff. ¶ 23.) State Farm's withdrawal attempt caused Greer's bank to charge her two overdraft fees of $31.00. (May–Jul. Bank Stmt. at 4.) And according to Greer, State Farm only reimbursed her for one of the fees. (Greer Aff. ¶ 24.) To add to the confusion, State Farm sent Greer another cancellation notice on

5

June 10, saying that if she failed to pay $634.34 by June 25, her homeowner's insurance policy would be cancelled on June 27. (Def.'s Mot. Ex. E.) In response, on June 18, Greer paid $450 directly to the Hughes Agency, which Vickers says kept her policy in force. (Greer Aff. ¶ 25; Vickers Aff ¶ 10.) But Vickers told her that she had to return to the automatic payment plan in July "without exception." (Vickers Aff. ¶ 11; Greer Aff. ¶ 25.)

The confusion spiraled even further in July 2013. On July 5, State Farm sent Greer a notice saying that if she did not pay $819.51 by July 20, her homeowner's insurance policy would be cancelled on July 22. (Def.'s Mot. Ex. F, July Cancellation.) Again, Greer says this amount was "without explanation." (Greer Aff. ¶ 26.) And indeed, like the other cancellation notices, it fails to note how much of the amount owed was attributable to the homeowner's insurance policy rather than the other two policies.

In response, Greer made two payments in person in July 2013. She initially paid $185 to the Hughes Agency. (Greer Aff ¶ 26; Vickers ¶ Aff 13; Payment and Bill History at 2.) But in a July 17 letter, State Farm informed Greer that it was returning her $185 payment because the total amount due was $819.51 and State Farm "cannot accept partial payments." (Pl.'s Mot. Ex. 13, Letter from Daphne Peek.) The letter also said (contrary to what Ms. Vickers told Greer the prior month), "Your payment plan account remains closed, and one or more of the policies on your account remains cancelled." (*Id.*) It also instructed her to pay $819.51 by August 21, 2013 for "possible future insurance coverage." (*Id.*) State Farm never actually returned the $185. (Greer Aff. ¶ 27; Payment and Bill History at 2.) Greer then paid another $450 in person, which the Hughes Agency accepted "to keep the policy in force." (Greer Aff. ¶ 26; Vickers Aff. ¶ 14; Payment and Bill History at 2.) State Farm then billed Greer for another $752.62 in late July

6

(again without explanation), and Greer paid another $491 to the Hughes agency on July 31. (Greer Aff. ¶ 29; Vickers Aff. ¶¶ 15–16; Payment and Bill History at 2.)

On August 8, State Farm says it sent Greer another cancellation notice stating that if she failed to pay $261.62 by August 23, 2013, her homeowner's insurance policy would be cancelled on August 25, 2013. (Def.'s Mot. Ex. H, August Cancellation.) Although Greer does not affirmatively deny receiving this, she does say that State Farm "claims" that it sent the letter. (Greer Aff. ¶ 30.) The notice said, "[Y]our policies identified in this notice are hereby canceled effective 12:01 A.M. standard time on the cancellation date specified due to non-payment of the premium. . . . Should you wish to reinstate these policies, please forward your payment immediately. Payment prior to the date and time of cancellation will reinstate your policies. If paid after that date and time, you will be informed whether your policies have been reinstated and if so, the exact date and time of reinstatement. There is no coverage between the date and time of cancellation and the date and time of reinstatement." (August Cancellation.)  Vickers says she spoke with Greer about the cancellation. (Vickers Aff. ¶ 17.)

It is undisputed that Greer did not directly submit $261.62 by State Farm's deadline. (Dkt. 34, Pl.'s Resp. at 4.) Greer says that if she did actually owe that amount, it was State Farm's fault that it was not paid: "On August 23, 2013, my bank account balance was $864.52, which was more than enough for State Farm to withdraw the $261.62 amount it claimed was due." (Greer Aff. ¶ 31.) She adds, "State Farm was to have resumed recurring monthly deductions as of the July payment; therefore, on the August 23, 2013 due date, State Farm was responsible for withdrawing the funds from my bank account and paying the premiums as they came due." (Greer Aff. ¶ 33.)

7

## C.

On September 2, 2013, Greer found that her home had been vandalized. (Greer Aff. ¶ 32.) She reported it to the Hughes Agency and made a claim for $164,409.85. (Greer Aff. ¶ 32; Def.'s Mot. Ex. M, Zielinski Aff. ¶ 5; Pl.'s Mot. Ex. 19, Sworn Statement in Proof of Loss.) Shortly after Greer's claim, she paid $265 to "reinstate" her policy. (Greer Aff. ¶ 34.) But State Farm refused to pay her claim, taking the position that her policy lapsed on August 25 because she had failed to pay the premium that was due. (Zielinski Aff. ¶¶ 6–7; Def.'s Mot. Ex. N, Denial Letter.)

Greer filed a three-count Complaint against State Farm in Wayne County Circuit Court on September 11, 2014, and the suit was removed to this Court on September 19, 2014. (Dkt. 1, Notice of Removal.) Count I contains "general allegations" and does not assert any particular cause of action. (Compl. ¶¶ 9–41.) Count II asserts a claim of "breach of express and implied contract." (Compl. ¶¶ 42–53.) And Count III asserts a claim of "negligence/res ipsa liquitur." (Compl. ¶¶ 54–61.)

State Farm filed its motion for summary judgment on March 9, 2015. (Dkt. 16.) Greer filed hers on March 23, 2015. (Dkt. 18.)

## II.

Because State Farm seeks summary judgment on claims for which it does not bear the burden of persuasion at trial, State Farm may discharge its initial summary-judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support [Greer's] case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If State Farm does so, Greer "must come forward with specific facts showing that there is a genuine issue for trial." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must

then determine whether the evidence presents a sufficient factual disagreement to require submission of Greer's claims to a jury, or whether the evidence is so one-sided that State Farm must prevail as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to Greer. *See Matsushita*, 475 U.S. at 587.

Greer's summary-judgment burden is greater. Because she seeks summary judgment on claims for which she has the burden of persuasion, her showing "must be sufficient for the court to hold that no reasonable trier of fact could find other than for [her]." *See Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984)). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to State Farm. *See Matsushita*, 475 U.S. at 587.

**III.**

Greer's claims were removed to this Court under its diversity jurisdiction. "[F]ederal courts sitting in diversity 'apply state substantive law and federal procedural law.'" *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). When deciding issues of substantive law, this Court must apply the law of the state's highest court. *Saab Auto. AB v. Gen. Motors Co.*, 770 F.3d 436, 440 (6th Cir. 2014). If the state's highest court has not decided the applicable law, state law must be ascertained "'from all relevant data,' which includes the state's appellate court decisions." *Id.* (quoting *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995)).

**A.**

Both parties first claim they are entitled to summary judgment for Greer's breach of contract claim. The Court is unpersuaded that either party is correct. A genuine issue of material fact surrounds whether State Farm was entitled to cancel Greer's homeowner's insurance policy and deny her claim due to her failure to pay the premiums on time.

State Farm hinges its argument on one provision in the homeowner's insurance policy: "When you have not paid the premium, we may cancel at any time by notifying you at least 10 days before the date the cancellation takes effect." (Policy at 19, Section I and Section II – Conditions, § 5b(1).) According to State Farm, "after not receiving the Plaintiff's full premium payment, State Farm sent a notice of cancellation to the Plaintiff on August 8, 2013, advising her that if she did not provide her required premium payment within seventeen (15) [sic] days (by August 23, 2013), her policy would be cancelled." (Def.'s Mot. at 8.) So, State Farm says it is off the hook for her September 2013 claim based on the vandalism damage—the policy had "cancel[ed]/laps[ed]" about a week earlier because Greer failed to "pay her unpaid premium balance by August 23." (*Id.*)

But the facts are not as simple as State Farm suggests. The problem for State Farm is that it has failed to show conclusively the extent to which, if at all, Greer had fallen behind on her homeowner's insurance policy premiums at the time State Farm says it was entitled to cancel her policy. The record shows that Greer made the following lump-sum payments for her three policies prior to her claim: $491 (January), $389.47 (February), $156.11 (March), $491 (April), $145 (May), $450 (June), $185 (July), $450 (July), and $491 (July). (Payment and Bill History, at 2.) Added together, these payments throughout seven months are more than twice what Greer owed for a full year on her homeowner's insurance policy, which had an annual premium of

$1,552. (Policy Application.) True, much of her payments likely went to her automobile and life insurance policy premiums. But how much is unclear. Nothing in the record shows the breakdown of what Greer had paid and owed specifically on the homeowner's insurance policy at the time of State Farm's August 2013 cancellation attempt.

The primary record of payments that State Farm produced—a Payment and Bill History over the life of Greer's three policies—illustrates this issue. It simply lists one value for each payment and bill, without any breakdown of what portion applies to the premiums for her life, automobile, and homeowner's insurance. The four cancellation notices that State Farm sent Greer in May, June, July and August are no more helpful. Each notice specifies an amount that Greer had to pay by a certain date to prevent the automobile insurance and homeowner's insurance policies from lapsing. But the notices make no mention of what portion of the amount owed applied to which policy. Without such a breakdown in the record, it is impossible for the Court to know whether Greer was actually behind in premium payments by August 2013 for her homeowner's insurance policy. It is thus equally impossible to determine as a matter of law whether State Farm was entitled to deny coverage.

The payment and billing history in the record is far too murky for such a finding. After Greer paid her initial January 2013 installment of $491 to cover the monthly premiums for all three insurance policies—homeowner's, life, and automobile—State Farm never billed her for that agreed amount again. Instead, leading up to its attempt to cancel her homeowner's insurance policy in August 2013, State Farm changed the amount it billed Greer each month and sometimes billed her twice: $389.47 in February, $156.11 in March, $635.17 in April, $145.17 and $634.34 in May, $819.51 in June, $819.51 and $752.62 in July, and finally $261.62 in August. (Payment and Bill History, at 2.) Greer maintains that State Farm never explained why

the premium amounts changed each month. (Greer Aff. ¶¶ 16, 17, 21, 23, 25.) And State Farm has provided no explanation here. Rather, State Farm avers in its response that it explained to Greer that the premium changes had to do with her auto insurance, which it says "has no relevance to this Motion." (Dkt. 33, Def.'s Resp. at 1–2.) But the auto policy is relevant because a main obstacle to finding in State Farm's favor is that the premium amounts for Greer's three policies were all lumped together into each monthly bill and payment, therefore clouding how much she owed or paid for each individual policy.

A reasonable jury could therefore find that State Farm was not entitled to cancel Greer's policy in August. The month before, her three in-person payments alone totaled $1,126. This was much more than the $819.51 State Farm requested to keep her policies in effect per its July cancellation notice, and even higher than the originally agreed $491 monthly installment for the three policies. If, as the August and July cancellation notices indicate, she was indeed behind in premium payments for both her homeowner's and automobile insurance policies, it is unclear why State Farm apportioned Greer's $1,126 July payments in a way that caused the homeowner's insurance policy to lapse, which had a much lower premium than the automobile policy. In months past, State Farm had certainly allowed Greer's homeowner's insurance policy to continue despite an overall payment that was insufficient to cover the full balance due on all three policies. For example, in June, State Farm demanded $634.34 to prevent the homeowner's and automobile insurance policies from lapsing. (June Cancellation Notice.) But State Farm allowed the homeowner's insurance policy to remain in effect despite receiving only a $450 payment. As Daisha Vickers from the Hughes Agency said, "On June 18, 2013, Ms. Greer visited our office and paid $450.00 toward her premium, which kept her policy from being cancelled at that time." (*See* Vickers Aff. ¶ 10.) In short, a genuine issue of material fact

12

surrounds whether Greer's homeowner's insurance policy lapsed due to insufficient premium payments.

State Farm's automatic withdrawal plan injects another fact issue into the mix. As Greer notes, she had authorized State Farm to withdraw the monthly premiums from her account, and in August 2013, she had more than enough money in her account to cover the $261.62 State Farm then demanded. (Pl.'s Mot. 21–22.) And though Greer had requested State Farm to stop the withdrawals months earlier, (Greer Aff. ¶ 19; Vickers Aff. ¶ 8), Vickers told her that, "without exception," she had to go back to automatic withdrawals in July. (Vickers Aff. ¶ 11; Greer Aff. ¶ 25.) Nothing in the record suggests that Greer opposed this reinstatement of the Plan. State Farm argues that it was not responsible for the withdrawals because it noted in a July letter to Greer that her "plan account remains closed, and one or more of the policies on your account remains cancelled." (Letter from Daphne Peek.) This letter, State Farm contends, was sufficient to meet the payment plan's cancellation terms, which provided, "State Farm has the right to discontinue the recurring payment option for any reason. State Farm will send notification to me at least ten (10) days in advance whenever the payment amount or the requested payment date changes." (Dkt. 33, Def.'s Resp. at 5.) But, if anything, this dispute surrounding the operation of the payment plan further reinforces the conclusion that a genuine issue of material fact exists for Greer's breach of contract claim.

All this is not to say that Greer is herself entitled to summary judgment. *See Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001) ("[I]f the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" (quoting 11

James William Moore et al., *Moore's Federal Practice* § 56.13[1], at 56–138 (3d ed. 2000))). State Farm may well be right that she failed to meet her end of the bargain because she was short on premium payments for her homeowner's insurance policy in August 2013. But the record does not make that clear. So, it is up to a jury to decide.

**B.**

Count II of Greer's complaint is titled "Breach of Express and Implied Contract." Her pleadings provide no clarity as to what her theory is concerning any implied contract in this case. In her briefs, however, she argues that if the payment plan "was not an integral part of plaintiff's policy, the agreements of the parties in the Payment Plan itself constituted its own implied contract." (Pl.'s Resp. at 10.) This claim fails as a matter of law.

"The Michigan Court of Appeals has routinely held that 'a contract will be implied only if there is no express contract covering the same subject matter.'" *DBI Investments, LLC v. Blavin*, No. 14-1398, — F. App'x —, 2015 WL 1379680, at *13 (6th Cir. Mar. 26, 2015) (citations omitted). While Federal Rule of Civil Procedure 8(a)(3) allows parties to plead demands for relief in the alternative, "A plaintiff can only plead breach of contract and implied contract claims in the alternative if there is doubt as to the existence of a contract." *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 32 F. Supp. 3d 824, 834 (E.D. Mich. 2014); *see also Cascade Elec. Co. v. Rice*, 245 N.W.2d 774, 777 (Mich. Ct. App. 1976) (holding that where defendant disputed existence of an express verbal contract, the plaintiff was not required to "elect to proceed under one theory or the other, but could seek recovery on the basis either of an express verbal contract, or an implied contract if the jury found that the express verbal contract did not exist"). Here, no one disputes the existence of the homeowner's insurance policy that expressly

governs the issues at the heart of this case. Thus, to the extent that Count II asserts a breach of an implied contract, it is dismissed as a matter of law.

## C.

The Court will also dismiss as a matter of law Greer's negligence claim. State Farm argues that "because the negligence claims only allege conduct that is specifically related to the State Farm's contractual obligations, that claim must be dismissed." (*See* Def.'s Resp. at 12.) The Court agrees.

"Under Michigan law, a defendant acting pursuant to a contract is liable in tort only if he or she 'owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations.'" *Ram Int'l, Inc. v. ADT Sec. Servs., Inc.*, 555 F. App'x 493, 497 (6th Cir. 2014) (quoting *Fultz v. Union–Commerce Assocs.,* 683 N.W.2d 587, 592 (Mich. 2004)). Greer identifies no such duty. In her Complaint, she alleges that State Farm owed these duties: (1) a duty "to create a proper insurance contract to provide insurance coverage for Plaintiff's Insured Property and to create a proper payment plan for payment of Plaintiff's premiums" and (2) a duty "of proper care, custody and control of funds withdrawn from Plaintiff's bank account and entrusted to Defendant, of proper accounting for all such funds withdrawn and proper payment of Plaintiff's insurance premiums." (Compl. ¶¶ 55–56.) In her limited argument on this issue in her brief, she contends that "defendant owed plaintiff the duty to perform its duties with reasonable care" and that "State Farm's breach of its duties, if not based on breach of contractual obligations owed to plaintiff, it was based on its negligent performance." (Pl.'s Resp. at 13.) This does not explain how any of State Farm's alleged duties were "separate and distinct" from its contractual duties. Therefore, Greer's negligence claim fails as a matter of law.

## IV.

While Greer is not entitled to summary judgment, she has raised a genuine issue of material fact as to whether State Farm breached her homeowner's insurance policy by refusing to pay her claim on the basis that her policy was no longer in force. But State Farm is entitled to summary judgment on Greer's implied contract and negligence claims.

Accordingly, Greer's motion for summary judgment (Dkt. 18) is DENIED. State Farm's motion for summary judgment (Dkt. 16) is DENIED as to Count II to the extent that Count II asserts a claim for breach of an express contract. State Farm's motion for summary judgment is GRANTED as to Count III and to Count II to the extent that Count asserts a claim for breach of an implied contract.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated: October 19, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 19, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson